Filed 11/4/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants and Respondents; <br><br> CHINA SHIPPING (NORTH AMERICA) HOLDING CO., LTD., et al., <br><br> Real Parties in Interest; <br><br> INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCALS 13, 63, AND 94, <br><br> Movant and Appellant. | B310783 <br><br> (Los Angeles County Super. Ct. No. 20STCP02985) |

APPEAL from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

SR Holguin, Steven R. Holguin and Marcos R. Holguin for Movant and Appellant.

Bayron Gilchrist, Barbara Baird, Veera Tyagi, Josephine Lee and Kathryn Roberts for Plaintiff and Respondent.

Meyers Nave, Amrit S. Kulkarni, Julia L. Bond, Shaye Diveley; Office of the City Attorney of Los Angeles, Michael N. Feuer, Janna B. Sidley, Justin M. Houterman and John T. Driscoll for Defendants and Respondents.

No appearance for Real Parties in Interest.

_____

A labor union moved to intervene in an environmental dispute about the Port of Los Angeles. The union is the International Longshore and Warehouse Union, Locals 13, 63, and 94 (the Union). The trial court denied the motion because concerns about expanding the case's scope outweighed the Union's interest. We will introduce the many actors and events in this multipolar environmental dispute by using the allegations of the petition filed by South Coast Air Quality Management District (the Air District). Then we explain why denying permissive intervention to the Union was proper. Statutory references are to the Code of Civil Procedure.

I

The Port of Los Angeles is the busiest seaport in the Western Hemisphere. It is critical for U.S. trade with Asia, and there is a lot of trade with Asia.

Within the Port is the China Shipping Container Terminal (the Terminal). The Chinese government owns China Shipping (North America) Holding Co., Ltd. (China Shipping), which leases the Terminal long term from various city entities.

2

The Terminal is a significant part of the Port. It and China Shipping handled 17 percent of the Port's cargo in 2019.

The city entities are parties here. They are the City of Los Angeles, the Los Angeles City Council, the Los Angeles Harbor Department, and the Los Angeles Board of Harbor Commissioners. We label this group the City Entities.

In 2001, the City Entities issued a permit to China Shipping to build the Terminal.

This project sparked immediate controversy: in the same year, environmental and community groups filed a lawsuit to challenge whether the City Entities, in approving the Terminal project, had complied with the California Environmental Quality Act (the Act).

The parties settled that suit. Part of the settlement required the City Entities to prepare an environmental impact report for the Terminal project. They completed the report in 2008. This report—the 2008 Report—found the project "would have significant and unavoidable adverse environmental impacts to air quality, aesthetics, biological resources, geology, transportation, noise, and water quality sediments and oceanography." Accordingly, the City Entities adopted more than 50 mitigation measures and several lease measures to reduce these impacts.

The 2008 Report specified the lease with China Shipping would be amended to incorporate the mitigation measures. But no one did amend the lease that way. In addition, several measures were implemented only partially, while others were ignored entirely.

In September 2015, the City Entities informed the Air District they intended to prepare a revised environmental

analysis for the Terminal to evaluate the unimplemented mitigation measures and to consider modified measures, among other items. After releasing draft reports and holding public hearings, the Board of Harbor Commissioners certified the final supplemental report in October 2019. The City Council approved it in August 2020, so we refer to this report as the 2020 Report. This approval let the Terminal operate under revised conditions.

The 2020 Report eliminated some mitigation measures from the 2008 Report. It also recognized that Terminal emissions would have significant, unavoidable, and *increased* impacts on air quality, and that the project would exceed a threshold for cancer risk.

Again, nothing enforced the mitigation measures: the City Entities did not require a lease amendment. Further, China Shipping wrote it did not intend to implement or to pay for the new measures.

In September 2020, the Air District filed a petition for writ of mandate claiming the City Entities had not enforced the mitigation measures listed in the 2008 Report. The suit likewise challenged the decisions to certify the 2020 Report and to allow the Terminal to operate under allegedly inferior measures. The petition named each of the City Entities as respondents, as well as the following real parties in interest: China Shipping (North America) Holding Co., Ltd.; COSCO Shipping (North America), Inc.; China COSCO Shipping Corporation Limited; and West Basin Container Terminal LLC. We will call these last four the China Shipping Entities.

The Air District's petition condemned the 2020 Report in many ways:

4

1. The report used the wrong baseline for environmental analysis.
2. Its project description was misleading.
3. Its impact evaluation was inadequate.
4. Some of the mitigation measures were uncertain and unenforceable.
5. The mitigation monitoring and reporting program was inadequate.
6. It failed to adopt all feasible mitigation measures.
7. It rejected measures from the 2008 Report and alternatives without proper findings.
8. It did not support the Findings and Statement of Overriding Considerations with substantial evidence.
9. It did not respond adequately to public comments.

The petition asked the court to, among other things, set aside the approvals for the Terminal project and the permit, pending compliance with the Act. It also asked for the City Entities to nullify certification of the 2020 Report and to disallow continued operation of the Terminal under that permit.

In November 2020, the California Attorney General and the California Air Resources Board (which we call the Board) filed a joint motion to intervene in the lawsuit, asserting they were entitled to mandatory intervention under section 387, subdivision (d)(1). The Board also sought permissive intervention under section 387, subdivision (d)(2). The Board was involved in the underlying administrative proceedings. It had opposed certification of the 2020 Report.

Later in November 2020, the Union filed a motion seeking permissive intervention. The Union claimed up to 3,075 of its members stood to lose their jobs should the Air District obtain

5

the relief it sought, which would result in an indefinite closure of the Terminal. The Union argued no existing party could protect its members' interests adequately.

The City Entities filed briefs in the trial court supporting the Union's intervention motion and opposing the Board's intervention motion. No one opposed intervention by the Attorney General.

At a hearing in January 2021, the trial court denied the Union's motion, granted a limited mandatory intervention to the Board, and consolidated this action with another led by the Natural Resources Defense Council, Inc. All parties agreed to the consolidation.

The court agreed the *Attorney General* had a statutory right to intervene in the case.

The court observed the *Board* has primary statutory jurisdiction to regulate air pollution emissions from mobile sources. It also had a statutory responsibility to implement a Community Emissions Reduction Plan for Wilmington, a community bordering the Port identified as a disadvantaged community. The Wilmington plan includes several measures to reduce emissions from the Port and from freight traffic traveling to the Port. The court concluded the Board had a particularized regulatory interest in the Wilmington plan that the Terminal project and the litigation could affect.

Finally, the trial court ruled the Union's interest in the case was speculative and consequential—not direct and immediate, as required for permissive intervention—and the prejudice to existing parties outweighed the reasons supporting intervention. On the latter point, the court explained:

6

"Union lacks a direct interest in the case and Respondents and Real Parties can be counted upon to support the jobs issue. Unlike the Attorney General and [the Board], Union has no legal interest in the CEQA issues at stake and is only concerned with the consequences of a terminal shutdown. [The Air District] also is correct that another intervening party would complicate the litigation."

The Union appealed this ruling. The City Entities filed a brief in support of the appeal.

## II

The trial court denied the Union a seat at a table. Seating at that table already was crowded. The court's exercise of its discretion was proper.

Under the statute for permissive intervention, trial courts have discretion to permit nonparties to intervene in a lawsuit, provided each of the following four factors are met:

1. the nonparty follows proper procedures;
2. it has a direct and immediate interest in the action;
3. intervention will not enlarge the issues; and
4. the reasons for intervention outweigh any opposition by the existing parties.

(§ 387, subd. (d)(2); *Edwards v. Heartland Payment Systems, Inc.* (2018) 29 Cal.App.5th 725, 736 (*Edwards*).)

The trial court must balance the interests of those affected by a judgment against the interests of the original parties in pursuing their case unburdened by others. (*City and County of San Francisco v. State of California* (2005) 128 Cal.App.4th 1030, 1036 (*San Francisco*).) The trial court has broad discretion to strike this balance. (*Ibid.*) We thus review for abuse of discretion. (*Edwards, supra,* 29 Cal.App.5th at p. 736.) We

presume the judgment is correct, affirm if it is correct on any theory, and reverse only if the appellant establishes the decision results in a miscarriage of justice or exceeds the bounds of reason. (*Ibid.*; *San Francisco*, at pp. 1036–1037; *City of Malibu v. California Coastal Com.* (2005) 128 Cal.App.4th 897, 906 (*Malibu*).)

Much of the briefing focuses on the second factor of the permissive intervention test—that is, whether the Union's interest suffices.

We affirm based on the fourth factor: the trial court reasonably concluded the Air District's interest in litigating the case without Union involvement outweighed the Union's reasons for intervening. Even if the interest is direct, denying permissive intervention in such circumstances is proper. (See *People v. Superior Court (Good)* (1976) 17 Cal.3d 732, 737.)

This consolidated environmental case is complex. It has an impressively large cast of characters. The trial court aptly noted this case "already has a lot of lawyers in it." With the addition of the Attorney General and the Board, we count eight petitioners, four respondents, and four real parties in interest.

The Union admits its position on the merits is duplicative: it supports the City Entities, seeks to defend their actions concerning the Terminal, and has no concerns with the challenged environmental analysis in the 2020 Report. Beyond this, the Union says it is acutely and uniquely interested in the consequences of a "potential remedy" should the petitioners prevail: the possible shutdown of the Terminal and the loss of Union jobs that could flow from rescinding the relevant permits and approvals. Thus the Union seeks to intervene in this

8

litigation to "advocate for a remedy that does not shut the terminal down . . . ."

The City Entities want the same thing.

The Union is not the only one seeking to maintain operations—and thus jobs—at the Terminal.  Both the Union's and the City Entities' briefs make this plain.

The evidence also shows that existing parties support continuing the Terminal's operation.  The Los Angeles Harbor Department prepared findings for the Terminal project.  These findings conclude the benefits of the project outweigh its unavoidable adverse environmental effects and would justify adopting the project and certifying the 2020 Report.  This report identifies "continued operation of the [China Shipping] Terminal under feasible mitigation measures, providing economic benefits to the Port and the community" as one benefit.  The report specifically discusses jobs provided by the Terminal.  The report says this consideration alone would be sufficient to outweigh the adverse environmental impacts of the project.

There is no claim the City Entities lack motivation to defend their approval of the Terminal project and its continued operation.  Nor is there any suggestion the City Entities or the China Shipping Entities might carve out Union jobs as unimportant or indefensible while fighting to maintain operations at the Terminal.

It thus was reasonable for the trial court to conclude that Union participation would be largely cumulative and would unduly complicate an already complicated case.

A Union declaration underscores this risk of undue complexity.  The declaration says the income of approximately 3,075 Union members depends on operations at the Terminal,

9

and the Terminal also "provides approximately 80,000 indirect jobs in the Los Angeles region." The trial court reasonably could conclude that permitting Union intervention in the lawsuit would spur representatives of the other tens of thousands of jobs connected to the Terminal to enter the fray. That result would be unmanageable. (See *Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250, 1270, fn. 17 [whether to permit intervention requires a fact-specific inquiry focused on practical considerations].)

The Union's logic reveals the weakness of its position. The Union has an interest in the Port's operation, but so do consumers affected by whether this commercial hub is functioning smoothly.

The ripples from this pebble in the pond extend yet further. All people within breathing distance of the Port also have interests in the controversy.

The trial court had no mandatory obligation to open the gate to every potentially affected interest that might mobilize itself to appear. Experienced trial judges must balance the practical realities of trial court management against the claims of all wishing to be heard directly. This trial court's decision was sound.

The Union emphasizes no party other than the Air District opposed its intervention. This point does not diminish the Air District's valid concerns, which the trial court shared. (See *Malibu, supra*, 128 Cal.App.4th at p. 901.)

The Union also says the trial court acted arbitrarily by denying the Union's motion but by allowing the Board to intervene. The Union argues its interest in the litigation is more direct and immediate than the Board's.

This argument overlooks the difference between mandatory and permissive intervention.  Regarding the Board, the court's lengthy analysis focused on the requirements for mandatory intervention.  The court ultimately granted the Board a limited mandatory intervention:  the court confined the Board's intervention to the mitigation measures in the 2020 Report that could affect the Wilmington emissions plan.  No one appealed that ruling, which is not before us.

A footnote in the court's decision did note, without explanation, that the Board was entitled to permissive intervention for similar reasons.  This alternative ruling does not show the court should have allowed the Union into the case solely on permissive grounds.

Because it was reasonable to conclude the reasons opposing Union intervention were weightier than those supporting it, denying permissive intervention by the Union was proper.

## DISPOSITION

We affirm the trial court's order and award costs to the South Coast Air Quality Management District.


WILEY, J.


We concur:


GRIMES, Acting P. J.        STRATTON, J.


11